IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM RAGEN, dba
RAGEN ASSOCIATES,

                          Plaintiff,                 Case No. 3:08 CV 1022

          -vs-

                                         <u>MEMORANDUM  OPINION</u>

HANCOR, INC., et al.,

                         Defendant.

KATZ, J.

Plaintiff William Ragen (who does business as Ragen Associates) spent twenty years as a manufacturer's representative, selling pipe and related drainage products made by defendant Hancor, Inc. During those years, the relationship evolved and changed in several ways. The parties started with a written contract in 1988 and updated it in writing in 1992, 1993, 1994, 1995, 1996, and 2001. The parties also frequently modified the terms of the sales relationship, usually by Hancor telling Mr. Ragen that it was adding or removing territory, customers, and access to product lines. In 2005, defendant Advanced Drainage Systems Inc., which was a long time competitor of Hancor, acquired Hancor. Over time, ADS took over some Hancor operations, yet also strived to maintain some legacy Hancor operations in place and, at least to an extent, operate independently. In 2007, the combined corporate management opted to end Hancor's and ADS' sales relationship with Mr. Ragen.

Mr. Ragen filed an amended complaint with this Court containing nineteen claims for relief. (Doc. 52.) Claims 3, 5, 8, 9, 11, 12, 13, 14, 16 and 17 were dismissed, either by the Court in response to a motion to dismiss or voluntarily. (Docs. 68 & 96.) Three summary judgment motions are now before the Court. Mr. Ragen has filed a partial summary judgment motion asking for judgment in his favor on Claims 1 and 2 against only defendant Hancor, which Hancor

opposes. Hancor has filed a partial summary judgment motion asking for judgment in its favor on just certain theories contained within claims 1 and 2 and for judgment in its favor on claims 4, 7, 10, 18, and 19. Hancor has acknowledged that some theories contained in Claims 1 and 2 must go to trial. ADS has filed a summary judgment motion asking for judgment in its favor on all claims that remain against it (1, 2, 4, 7, 10, 15, 18, and 19). Mr. Ragen opposes both defendants' motions.

## I. JURISDICTION

The amended complaint reflects that Mr. Ragen is a citizen of New Jersey. (Doc. 52 at ¶ 2.) Defendant Hancor Inc. is incorporated in Ohio with its principal place of business in Ohio.(*Id.* at ¶ 3.) Defendant Advanced Drainage Systems, Inc. is incorporated in Delaware and its principal place of business is in Ohio. (*Id.* at ¶ 5.); *see* 28 U.S.C. § 1332(c). The complaint alleges damages in excess of $75,000. (*Id.* at ¶ 1.) The defendants admit to the citizenship of each corporation as alleged in the complaint. (Answer, Doc. 58.) The Court has diversity jurisdiction since, at the time of the filing of the complaint, complete diversity existed between the plaintiff and defendants and the amount in controversy exceeds the threshold. 28 U.S.C. § 1332.

## II. STANDARD

Summary judgment is appropriate where, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of, "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted). The movant may meet this burden by demonstrating the

2

absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party can avoid judgment only by setting forth facts that show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(a) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter," *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch*

3

*Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### III. CHOICE OF LAW

Each written contract submitted into evidence contains a provision specifying that Ohio law shall be used to construe the terms of it. (Doc. 52-1 at ¶ 12; Doc. 52-2 at ¶ 13(e); Doc. 52-3 at ¶ 12(e); Doc. 52-4 at ¶ 12(e); Doc. 52-6 at ¶ 12(e); Doc. 52-7 at ¶ 12(e); Doc. 52-10 at ¶ 12(e).) Even though Mr. Ragen worked in several eastern states, Ohio has adopted the Restatement (Second) of Conflict of Laws Section 187, which prioritizes the parties' choice within a contract over other states unless the chosen state, "has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or application of the chosen state's law conflicts with the fundamental policy of the state that would otherwise be chosen. *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.* 453 N.E.2d 683, 686 (Ohio 1983). Neither party has argued for any other choice of law and neither exception to the Restatement principal is apparent in this case. The Court will use Ohio law.

### IV. MR. RAGEN'S PARTIAL SUMMARY JUDGMENT MOTION

Mr. Ragen's summary judgment motion asks the Court to find that Hancor breached the written agreement between Mr. Ragen and Hancor by, on a few occasions, unilaterally reducing his territory without committing those changes to writing as was required in each written agreement. Mr. Ragen can show that a series of written agreements with Hancor outlined and governed their sales relationship over the course of a number of years. (Doc. 52-1 (1988

4

agreement); Doc. 52-2 (1992 agreement); Doc. 52-3 (1993 agreement); Doc. 52-4 (1994 agreement); Doc. 52-6 (1995 agreement); Doc. 52-7 (1996 agreement); Doc. 52-10 (2001 agreement)). These agreements define Mr. Ragen's sales territory according to geography, product line, and type of account. They also contain clauses requiring all changes to each agreement to be in writing and accepted by both parties. (*E.g.*, doc. 52-10 at ¶ 12(a) ("Amendment of Agreement. Neither this Agreement nor any term hereof may be amended, changed, or modified in any manner except by an instrument in writing which refers to this Agreement and is executed by each of the parties hereto.").) Mr. Ragen can show that, through the many years of their relationship, Hancor repeatedly modified his sales territory and removed customers without properly modifying the agreements in writing. Hancor does not dispute that it modified the sales territory without a written amendment to the contract, but contends the original contract may not have required territory modifications to be in writing, that the modifications may have been an oral agreement to both modify the territory and to modify the no-oral clause, and Mr. Ragen has waived his right to bring a cause of action for breach because, in continuing the sales relationship for many years, he induced Hancor to believe he waived his right to complain of their breach. Because evidence of any one of these arguments would defeat Mr. Ragen's partial summary judgment motion, the Court need not explore each and instead focuses just on waiver by estoppel.

A breach of a contract is any failure to perform as the contract specifies when the duty to perform exists. *Radio Parts Co. v. Invacare Corp.*, 897 N.E.2d 228, 235 (Ohio Ct. App. 2008); *see also* Restatement (Second) of Contracts § 235(2) ("When performance of a duty under a contract is due any non-performance is a breach."); *accord Aluminum Line Products Co. v. Brad Smith Roofing Co., Inc.*, 671 N.E. 2d 1343, 1351 (Ohio Ct. App. 1996). Mr. Ragen contends that the

5

evidence of Hancor's and ADS' breach is so uncontroverted that, not only can he defeat the defendants' summary judgment motions, but he is entitled to summary judgment himself on these points. He says he can show the court that the contracts included a specification of his territory and a no-oral modification clause. He also claims he can demonstrate that Hancor modified his territory, so, he says, the breach is evident.

Even if Mr. Ragen can demonstrate breach of the no-oral modification clause, Hancor may be relieved of liability if it can demonstrate waiver. Normally, one party's breach may excuse the other party's obligation to perform under a contract, but where the non-breaching party performs in spite of the other's breach and continues to receive the benefits of the contract, in certain cases he may have waived his right to demand the performance or receive damages stemming from the breach. "There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived." 13 Williston on Contracts § 39:31 (4th ed.). Broadly, the term waiver describes a party's voluntary relinquishment of a right. This type of waiver generally requires consideration to be binding on the one who relinquished the right. *Marfield v. Cincinnati, D. & T. Traction Co.*, 144 N.E. 689, 691 (1924) (noting that when waiver is defined as a voluntary relinquishment of a known legal right, it, "must be supported by a consideration which may be either a benefit to the promisor or a disadvantage to the promisee."). Hancor claims that Mr. Ragen both explicitly and implicitly (and often grudgingly) accepted oral modifications to the contract (including oral modifications to the no-oral modification clause) and that the consideration for Mr. Ragen's waiver of his contractual

6

right to written modifications is Hancor's forbearance of its right to terminate the contract any time.

The Court need not explore the intricacies of waiver of rights in this light because another, more specific, version of waiver applies. Where waiver generally is voluntarily giving up a contract-based right, a specific subset of waiver has its roots in estoppel. *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust*, 804 N.E. 2d 979, 1000 (Ohio Ct. App. 2004). It involves relinquishing a right, but the lynchpin of this subset of waiver is not when one party forgoes something to which he might be entitled in exchange for consideration, but when he induces the other party to rely on his waiver and continued performance under the contract. *Motz v. Root*, 4 N.E.2d 990, 991 (Ohio Ct. App. 1934) ("There are also circumstances which justify what may be designated as a waiver by estoppel, such as where the acts and conduct of a party inconsistent with an intention to claim the right have been such as to mislead the other party to his prejudice, and thereby estop the party having the right from insisting upon it."); *accord Mark-It Place Foods*, 804 N.E. 2d at 1000. "A waiver is a voluntary relinquishment of a known right," and signals to the other party a willingness, "to dispense with complete performance at a time when the obligor might fully perform." *List & Son Co. v. Chase*, 88 N.E. 120, 122 (Ohio 1909). The waiver by estoppel doctrine prevents the would-be wronged party from first acting as if he accepts the flawed performance long enough for the other party to rely on that and continue delivering under the contract and then later claiming the contract was breached and damages are owed. Such waiver, "may be accomplished by acts or conduct and there may be an estoppel from insisting upon the right claimed to have been relinquished, in which event no consideration is necessary." *Marfield v. Cincinnati, D. & T. Traction Co.*, 114 N.E. 689, 691 (Ohio 1924).

7

The record shows that Mr. Ragen has evidence sufficient to establish Hancor's breach by showing that the written agreements created the sales territory and required modifications to be in writing and then by showing that Hancor both added and removed territory and customers without Mr. Ragen's explicit or written consent. Notwithstanding that, Hancor has pointed to significant evidence in the record from which a fact finder may find that Mr. Ragen may be estopped from bringing these claims because he waived his right to raise these breaches in an action. For example, Mr. Ragen testified in his deposition:

Q. The Paragraph 184(B) indicates that Hancor unilaterally removed the Bronx, Kings, Nassau, New York, Queens, Richmond and Suffolk Counties effective August 1st, 1995, and your position in this lawsuit is that was a breach of contract because it was not signed - there was no signed and written amendment to evidence  that it was agreed to, fair?

A. My contention is that they removed it without my approval and agreement.

Q. And what did you do to evidence that you did not agree with the removal of those counties?

A. Well, I don't know what's in the documentation. I do know, as evidenced by the letter that we produced when I got it back, that I obviously got Bob Wicks to make a promise that he would give it back if they proved me wrong.

Q. And I guess my question is a little different, and that is, what did you do to communicate to Hancor that you did not agree with the decision to remove those counties?

A. I know there is some production that we have done which shows some correspondence from around this time, August 1st, 1995, where they were requesting that I, I believe, hire somebody exclusively in the territory or whatever, and I was arguing that that w

Q. Did you refuse to continue serving as a direct sales representative for Hancor?

A. As I said before, somebody cuts off a foot, I'm not going to proceed then to slit my own throat, which would have been the effective result of terminating the contract.

Q. So you continued then to serve as a manufacturer's representative of Hancor, following the decision to modify the territory as set is forth in 184(B)?

A. Under protest, yes, and it's not -- doing that is not the same as agreeing to that modification. It wasn't in my power to reverse that decision.

8

Q. It was in your power though to indicate that you wouldn't go forward with it, correct?

A. And it was in my power to go forward under protest. I was not agreed - it was very clear that I didn't agree to it to everybody concerned.

Q. You continued to operate as a manufacturer's representative for Hancor following the modification of the territory, correct?

A. Yes, I did.

Q. And you continued to promote products in your existing territory, right?

A. Yes, I did.

Q. And you continued to be compensated for the sale of those products?

A. Yes, I did.

Q. And you don't --

A. And as soon as that territory became open again, I reminded Bob Wicks of his promise, that if I proved to be right and he proved to be wrong, he would put those counties back in my territory. That was the next contract.

(Ragen Dep. Sept. 14, 2011, Doc. 108 at 161-163.) Mr. Ragen's testimony about the other modifications also reflects this same reality: he was not happy with having territory taken away, but he kept working for Hancor and never exercised his right to terminate the contract.

Nowhere does Hancor have a greater potential to demonstrate Mr. Ragen's waiver than through his decision to accept the territorial modifications grudgingly, but commit to changing the minds at Hancor either through stellar performance on his part or by pointing out lackluster performance on his replacement's part. This is evidence that Mr. Ragen decided to work from within the system to change it to his liking rather than rejecting the modification. As such, this is evidence of waiver by estoppel, and, if believed, could show that Mr. Ragen accepted the territorial modifications and waived his right to raise them later as breaches of contract. *See Nat'l City Bank v. Rini*, 834 N.E.2d 836, 840 (Ohio Ct. App. 2005) ("In particular, 'waiver by estoppel' exists *when the acts and conduct of a party are inconsistent with an intent to claim a right*, and

9

have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." (quotations omitted) (emphasis in original).

The Court need not go further in analyzing Hancor's other theories because it has pointed to enough evidence in the record to demonstrate a question of fact as to whether Mr. Ragen waived any potential breaches and is estopped from claiming them now. The Court must deny Mr. Ragen's partial summary judgment motion in its entirety.

## V. ADS' AND HANCOR'S SUMMARY JUDGMENT MOTIONS

Both ADS and Hancor have moved for summary judgment with ADS asking the Court for complete summary judgment and Hancor asking for partial judgment and acknowledging that certain questions will require a trial to resolve. Claims 1, 2, 6, and 7 assert breaches of contract, but before the Court can decide those summary judgment questions, the Court must determine whether ADS is liable for potential contract breaches. Mr. Ragen also raises a claim sounding in estoppel and several non-contract claims which follow the analysis of the contract-based claims.

### A. ADS' LIABILITY

In 2005, ADS acquired its competitor Hancor in a stock purchase and owned it for the duration of the time in question. Immediately after the acquisition, Mr. Ragen continued to work for Hancor, then a wholly owned subsidiary of ADS, and ADS management controlled the operations of Hancor. Over time, the two companies integrated operations considerably. Mr. Ragen included ADS as a defendant and four of Mr. Ragen's claims against ADS are accusations of a breach of contract: Claims 1, 2, 6, and 7. Because the contract is written between Hancor and Mr. Ragen, and because it is not expressly modified in writing to include ADS as a party, before the Court can address whether the agreement was breached, it must address whether ADS can be

10

held liable for any breach or whether that question is solely between Mr. Ragen and Hancor. Mr. Ragen proposes four theories under which ADS could be liable for breaches before and after the acquisition.

1. WHETHER ADS JOINED THE CONTRACT PROSPECTIVELY

ADS moves the Court to find as a matter of law that it was not a party to the 2001 Agreement with Mr. Ragen so it cannot be liable for breaches of that agreement. Mr. Ragen argues that either ADS placed itself into the agreement as an additional "Manufacturer" or ADS replaced Hancor in the contract's "Manufacturer" role. His theory for holding ADS liable for breaches after the acquisition rests on him proving either: (1) he entered into a new, oral agreement with ADS that augmented or supplanted the Hancor contract, (analyzed in Section 2, *infra*), or (2) ADS joined the 2001 written agreement by oral modification, replacing or supplanting Hancor..

Mr. Ragen cites *Mbis, Inc v. Carter, McCormic & Peirce, Inc.*, to support his theory that a court can look at an oral agreement to "continue to sell" to determine if one party replaced another in a manufacturer's representative's contract and created a liability for commissions. No. 41145, 1980 WL 354881 (Ohio Ct. App. Aug. 21, 1980). In that case, the original manufacturer, Gilmore, filed bankruptcy and the manufacturer's representative firm produced evidence showing that the manufacturer asked the representative to continue to sell for the new entity and promised commissions. "There was competent, credible evidence going to all the essential elements of that portion of appellee's counterclaim alleging commissions due from appellant after the bankruptcy proceedings of Gilmore Industries. Therefore, we are unable to say the judgment was against the weight of the evidence." *Id.* The facts in *Mbis* do not perfectly align with those in this case.

11

Gilmore Industries was no longer an ongoing entity and Mbis, Inc. was doing business in its stead, performing on and, to some extent, paying on its preexisting contracts. In this case, ADS contends that Hancor remains a viable company, only purchased by ADS and Mr. Ragen's long and compensated sales relationship did not switch from Hancor to ADS in the same way that the sales representative's relationship shifted from Gillmore, Inc. to Mbis, Inc.

Nevertheless, Mr. Ragen points to evidence tending to show ADS and Mr. Ragen were in contract (either by ADS supplanting Hancor's contractual role or by ADS striking a unique oral agreement with Mr. Ragen). Mr. Ragen can show that ADS' message about whether Hancor was to remain a separate company with common ownership or whether ADS and Hancor were to become one company was confusing. (*See, e.g.*, Doc. 131-6 (Acquisition press release, which includes a quote from ADS' president, Joe Chlapaty, stating: "Today's announcement is about the confluence of two strong companies that will now become one great company."); *see also* Doc. 102-1 (email from Chlapaty to Mr. Ragen, announcing the acquisition and claiming, "Although we will maintain the Hancor product line and name, we will operate as one company with one culture."). (*But see* Klein Aff., Doc. 118-2 (claiming that, after the acquisition, Hancor was a wholly owned subsidiary of ADS).) Mr. Ragen can also show that Hancor's management team members were either ADS employees themselves or were directly reporting to ADS management. (Fussner Dep., Doc. 102 at 20 ("Q. Does the fact that Hancor officers had to report to ADS officers indicate to you that the ADS officers were the superiors of the Hancor officers? A. Superior in an organizational structure, yes. Q. And as the superiors in an organizational structure, they could - they had the ultimate decision-making authority over matters affecting Hancor, correct? A. Yes.").) Additionally, management talked in terms of Mr. Ragen's contribution to

12

ADS. (Doc. 131-1, at 185 (email reprimanding Mr. Ragen for his obsession with the fairness of pricing after the acquisition and admonishing him, "I would propose your time would better serve the ADS organization if you were to spend three days a week in the Lower Hudson Valley calling on contractors and engineers with your distributors."); *see also* Doc. 131-3 at 160 (letter on joint Hancor/ADS letterhead terminating Mr. Ragen: "Pursuant to our contract with Ragen Associates . . . this will serve as our 30-day notice of termination of your services for Advanced Drainage Systems, Inc."); Doc. 114-2 at 158 (letter on joint ADS/Hancor letterhead with tag line, "One Company, One Culture.").) Furthermore, ADS paid employees and subcontractors (including Mr. Ragen) directly on its checks rather than through Hancor accounts. (Fussner Dep., Doc. 102 at 30-31; Ragen Decl., Doc. 131-3 at 27; Doc.131-3 at 138-149 (mix of Hancor and ADS checks); *id.* at 151 (2007 Form 1099 issued by ADS to Mr. Ragen).)

This evidence - particularly the evidence that, after the acquisition, ADS managed Mr. Ragen and paid him directly - creates a question of fact as to whether ADS became a party to the contract. This analysis is completely separate from holding ADS accountable for Hancor's conduct as a party to the contract, such as by piercing the corporate veil or determining the companies merged, discussed in Sections 3 and 4, *infra*. However, because Mr. Ragen can show he had an ongoing business relationship with ADS (ADS' management of him and the considerable sums ADS paid him), he has shown enough evidence that he had some contractual arrangement with ADS. Furthermore, he has pointed to considerable evidence that his business relationship with ADS was, with some modifications, a continuation of the long-standing relationship with Hancor. While ADS and Hancor point to considerable evidence in the record

13

showing that they strived to maintain two separate companies and kept Mr. Ragen working for just Hancor, in the context of summary judgment, this evidence's role is limited.

Once Mr. Ragen can show privity of contract with ADS, he must show breach to survive summary judgment (discussed in Section B, *infra*). In its summary judgment motion, Hancor concedes that the question of whether it breached the contract in certain ways is not appropriate for summary judgment and must go to trial. (Doc. 119 at 13 ("Plaintiff's breach of contract claims at counts one and two against Hancor raise a variety of issues, some of which will ultimately have to be tried to the Court.").) The Court must deny ADS' request for summary judgment on the breach of contract claims after the acquisition. To the extent those claims stand against Hancor, they may stand against ADS if Mr. Ragen proves at trial that ADS supplanted Hancor as the manufacturer in the agreement or added itself as an additional manufacturer.

2. CREATION OF A NEW, ORAL CONTRACT BETWEEN MR. RAGEN AND ADS

In Section 1, *supra*, the Court allowed the possibility that Mr. Ragen could show that he was in contract with ADS (primarily based on evidence that ADS managed him and paid him after the acquisition). In addition to arguing that ADS became a party to the contract created between Mr. Ragen and Hancor (discussed in Section 1), Mr. Ragen also contends he and ADS struck a new and separate unwritten agreement that governed their relationship (expressed in Claim 6). Mr. Ragen's evidence of this alternate theory is the same; he can demonstrate that ADS managed and paid him in an ongoing, long-term sales arrangement. ADS, of course, denies that it became a party to the contract between Hancor and Mr. Ragen, but considering the totality of the circumstances, if ADS did not join the written agreement, then Mr. Ragen has some evidence to support the theory that Mr. Ragen and ADS were in a separate oral agreement.

14

Even though he may be able to demonstrate the presence of some agreement, Mr. Ragen has not presented evidence demonstrating the terms of that oral agreement coupled with instances where ADS breached those terms. Mr. Ragen says that the terms of this oral agreement must be "hauntingly reminiscent of those found in the 2001 Contract," since business continued after the acquisition much as it had before. (Doc. 131 at 53.) This theory rests on showing that the terms of the post-acquisition agreement are demonstrated by the course of performance between ADS and him (for instance by showing that he was paid by ADS, ADS executives made company decisions, and he was permitted to sell ADS products). *See* Restatement (Second) of Contracts § 202. ("Rules in Aid of Interpretation . . . (4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."). Yet, this theory presents a conflict: if the Court followed this logic and found that Mr. Ragen could establish the terms of the oral agreement by showing the course of conduct, then Mr. Ragen would next need to show the breach of those terms. He has not pointed to evidence showing that, after ADS' acquisition, he and ADS established a term by a consistent course of performance and then ADS breached that term. The core reason for this is that the conduct that Mr. Ragen points to as breaches of the written agreement with Hancor may become the course of performance with the alleged oral contract with ADS. Supporting this theory would be very difficult; Mr. Ragen would need to show that ADS consistently established terms of the new oral agreement (by course of performance) then made a sharp left turn and breached those very terms. The record and Mr. Ragen's arguments reflect the opposite: ADS' (and Hancor's) behavior was more consistent, either in breach of the written

15

agreement or not, but not establishing a new, oral agreement with ADS, then making a sharp turn and breaching it.

Thus, while Mr. Ragen has pointed to evidence in the record that could support a finding that he and ADS were in a separate, oral contract, he has not pointed to evidence that both establishes the terms of those from a course of performance and then shows a breach. ADS is entitled to summary judgment on the theory that its relationship with Mr. Ragen was ruled by an oral agreement struck after its acquisition of Hancor and that it then breached that agreement.

3. ADS' ASSUMPTION OF HANCOR'S PRE-ACQUISITION LIABILITY BY DE FACTO MERGER

Prior to its 2005 acquisition of Hancor, ADS was Hancor's competitor and not a party to the contracts made between Hancor and its sales representatives. Mr. Ragen claims ADS' 2005 acquisition of Hancor by stock purchase made ADS liable for breaches of the various agreements that occurred prior to 2005. He proposes the Court pierce Hancor's corporate veil and hold its sole stockholder, ADS, liable for Hancor's debts stemming from breach of contract. The Court analyzes that in Section 4, *infra*. He also proposes that ADS' purchase of Hancor amounted to a de facto merger of the two companies making ADS liable for Hancor's pre-acquisition liabilities. The Court addresses that theory here.

When an individual or a corporation acquires a corporation in a stock purchase, by default, the acquiring person or corporation does not automatically assume the existing contracts and obligations of the target (acquired company). *Nat'l City Bank v. Plechaty Cos.*, 661 N.E.2d 227, 230 (Ohio Ct. App. 1995) ("A parent corporation is not liable for the debts of its subsidiaries, absent proof the parent exercised complete dominion and control over the subsidiary and such control was used to commit a fraud or injustice." (citing *Belvedere Condo. Unit Owners' Ass'n. v.*

16

*R.E. Roark Cos., Inc.*, 617 N.E.2d 1075 (Ohio 1995))). Mr. Ragen says that the Court should examine whether the purchase represents a de facto merger between ADS and Hancor. While the 2005 acquisition itself gives no indication of a merger between the two companies, Mr. Ragen focuses on the businesses in the years after the transaction and points out that ADS took Hancor's assets as its own, took over liabilities, began paying Hancor employees and subcontractors (including Mr. Ragen) directly, and generally conducted itself as if the companies merged.

Courts have examined asset purchases for the signs that the purchase is actually something more and that the purchaser could be liable for the seller's debts. "[A] corporation that purchases the assets of another corporation is not liable for the contractual liabilities of its predecessor corporation unless (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1133 (Ohio 1993) (quoting *Flaugher v. Cone Automatic Mach. Co.*, 507 N.E.2d 331, 334 (Ohio 1987). When a court finds one or more element present, it may deem the sale of assets a de facto merger and allow the purchasing company to be liable for its predecessor's obligations. *Id.*

Regarding the first element, Mr. Ragen has pointed to no evidence that ADS expressly assumed Hancor's liabilities. He has shown, however, that at some point after the acquisition, ADS began paying his commission checks. (Fussner Dep., Doc. 102 at 30-31; Ragen Decl., Doc. 131-1 at ¶ 24; Doc. 131-3 at 138-49 (mix of Hancor and ADS checks); *id.* at 151 (2007 Form 1099 issued by ADS to Mr. Ragen).) Addressing the second *Welco* element, while Mr. Ragen has not demonstrated that the original transaction acquiring Hancor amounted to a de facto consolidation

17

or merger, the close integration of the two companies in the ensuing years may be exactly that. (*See* Doc. 131-3 at 160 (letter on joint Hancor/ADS letterhead terminating Mr. Ragen); Fussner Dep., Doc. 102 at 30 (noting that by 2008, Hancor no longer had any direct employees); *id.* at 31-39 (explaining that in early 2006, Hancor receipts went directly to ADS accounts and at some time thereafter ADS began paying Hancor payables itself).) Regarding the third *Welco* factor, Mr. Ragen has also pointed to evidence demonstrating that ADS is a continuation of Hancor, citing the undisputed facts that ADS absorbed the employees and assets of Hancor and manufactures, distributes, and sells Hancor as a brand of ADS. As to the final *Welco* element, Mr. Ragen has not demonstrated that the defendants undertook any of these actions fraudulently to escape liability.

Notwithstanding the fact that Mr. Ragen has met the burden of showing some evidence on three of the four *Welco* factors (and the criteria are delineated with "or," meaning this should satisfy the summary judgment standard to go forward), this is not a typical de facto merger case. 617 N.E.2d at 1133. Courts look to the *Welco* test to see if a corporation has tried to orphan its debts in one entity while moving its producing assets to another. "Such would be the case when one corporation sells its assets to another corporation with the same people owning both corporations. Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation. This is actually a reorganization." *Id.* (quotation omitted). "This type of transaction is executed to escape liabilities of the predecessor corporation." *Id.* In such a case, a nexus exists between the plaintiff's claimed loss and the asset sale; that is, but for the questionable asset sale, the plaintiff might be able to recover.

Mr. Ragen has given the Court no indication that, even if the defendants merged the companies, they did so in order to avoid judgment. The record reflects that the ADS' and Hancor's

18

defense for not paying Mr. Ragen more than they did centers on their contrary view of how much commission Mr. Ragen was entitled to and that it is not related to their efforts to consolidate the purchased company.

In *Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.*, the court considered whether the *Welco* de facto merger test applied to consider whether – for purposes of insurance coverage and unrelated to escaping liability through corporate form – two companies merged. No. 1:03-CV-1322, 2009 WL 8632648 (N.D. Ohio Feb. 10, 2009). "Although the doctrine might be applicable in cases involving an uncompensated plaintiff or a frustrated creditor, nowhere in *Welco* does the court state that the doctrine is only applicable in such cases." *Id.* at * 7. This holding would support Mr. Ragen's use of de facto merger. The Court of Appeals affirmed on other grounds, however, cautioning,

> Because we conclude that the policies' plain language resolves these disputes, we need not consider the district court's de facto merger analysis. **We note, however, that federalism principles caution against a federal court expanding the de facto merger doctrine – a state-law equitable remedy concerning successor liability – into a general rule of contract interpretation.** *See, e.g., Grantham & Mann, Inc. v. Am. Safety Prods.*, Inc., 831 F.2d 596, 608 (6th Cir.1987) (explaining that federal courts applying state law must do so "in accordance with the then controlling decisions of the highest state court") (citations and internal quotation marks omitted).

*Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.*, 667 F.3d 669, 682 (6th Cir. 2011) (emphasis added).

Mr. Ragen springboards his argument regarding merger into his argument that he should have been paid commission whenever ADS legacy products were sold in his Hancor territory, rather than just being paid a commission when legacy Hancor products were sold there. He has not, however, demonstrated that he wants to add ADS because he is a creditor frustrated by a sale of assets. That is, his reason for asking the court to consider the de facto merger argument

19

resembles the plaintiff's reason in *Bondex* and he has not show it is related to an accusation that Hancor's assets have been raided leaving it unable to pay its liabilities. In the spirit of the Court of Appeals' caution against an expansion of *Welco*, (*Bondex*, 667 F.3d. at 682), the Court will grant ADS' summary judgment motion to the extent that Mr. Ragen wanted to hold ADS liable for Hancor breaches that occurred prior to the acquisition on the theory that it was, in fact, a merger.

4. PIERCING ADS' CORPORATE VEIL

Finally, Mr. Ragen suggests that the Court should not dismiss ADS as a party because Hancor's corporate veil should be pierced, and its sole stockholder, ADS, should be jointly liable for any instance where Hancor is liable. Ohio adopted three requirements to pierce the corporate veil that, "balance between the principle of limited shareholder liability and the reality that the corporate fiction is sometimes used by shareholders to protect themselves from liability for their own misdeeds." *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1086 (Ohio 1993). They are: "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id.*

Mr. Ragen has pointed to considerable evidence that Hancor's sole shareholder, ADS, exerted complete control over ADS. Evidence, discussed *supra*, may tend to show that ADS controlled every detail of its acquired subsidiary's operations. Nevertheless, complete control is not sufficient to avoid summary judgment. *Id.* ("[M]ere control over a corporation is not in itself a sufficient basis for shareholder liability."). "[W]e hold that to fulfill the second prong of the

20

Belvedere test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act. Courts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 545 (Ohio 2008).

Mr. Ragen points to several cases to support his position, but none stands for the concept that the extreme remedy of piercing the corporate veil can follow complete shareholder control combined with a contract dispute. These cases do not change the requirement of a nexus between the act and the loss. In *Clinical Components, Inc. v. Leffler Indus., Inc.*, the creditor plaintiff presented evidence that the stockholder systematically transferred assets out of the company as "consulting fees" paid to him and his brother-in-law, then defaulted on a bank note. No. 95-CA-0085, 1997 WL 28246, * 4 (Ohio Ct. App. Jan. 22, 1997). The inadequate documentation for the consulting fees around the time the company crossed into insolvency was enough evidence that the shareholder used his complete control to empty the company's coffers and thus defraud the bank to avoid summary judgment. *Id.* at * 5. Mr. Ragen stretches his analysis of this case to cover the facts in his case, but, whether or not he can show that the defendants contractually owe him more commission and were wrong to not pay him, he has not pointed to evidence that demonstrates the conduct of ADS and Hancor amounts to a fraud to avoid paying him.

Mr. Ragen also cites two cases that stand for the proposition that a violation of Ohio's Fraudulent Transfer Statute (Ohio Revised Code Section 1336.04) is prima facie evidence sufficient to satisfy the second prong of the Belvedere test. *Stewart v. R.A. Eberts Co., Inc.*, No. 08-CA-10, 2009 WL 2684497 (Ohio Ct. App. Aug. 18, 2009); *Fortress Value Recovery Fund I,*

*LLC v. Columbus Components Group LLC*, No. 1:11-CV-00200, 2011 WL 1130442 (N.D. Ohio

Mar. 28, 2011). The statute, however, sets a high bar of proving that a transfer was made with

either the intent to avoid a creditor or the knowledge that it would leave the company without

sufficient assets for a current or upcoming transaction. *See Flagstar Bank, FSB v. Sellers*, No. CA

2009-11-287, 2010 WL 3294683 (Ohio Ct. App. 2010) (citing *Stewart*, 2009 WL 2684497 at ¶¶

25-26). Mr. Ragen has not pointed to any evidence that ADS transferred Hancor's assets either

with intent to hinder, delay or defraud Mr. Ragen or that ADS prompted Hancor to enter into

business with Mr. Ragen while not leaving sufficient assets in Hancor to sustain that business. *See*

Ohio Rev. Code § 1336.04. He has therefore not met the standard for piercing the corporate veil

by showing a fraudulent transfer. Mr. Ragen's dispute with Hancor and ADS sounds in a contract

dispute, and the elements of a fraudulent transfer (and the elements of *Belvedere*) are not met. The

Court will not, therefore, pierce the corporate veil and grants summary judgment to ADS on this

theory.

5. SUMMARY OF ADS' POTENTIAL LIABILITY

Following ADS' summary judgment motion, Mr. Ragen presented four theories under

which the Court should not dismiss ADS as a party and should allow it to potentially be held

liable if the Court finds a breach of contract. The Court grants ADS' request on Mr. Ragen's

theory that ADS voluntarily assumed Hancor's pre-acquisition liability, the theory that ADS and

Mr. Ragen created a new, oral contract with certain definite terms which ADS then breached, and

the theory that Hancor's corporate veil should be pierced to hold its sole stockholder, ADS, liable.

This leaves only a limited case against ADS for breach of contract. Because the record

contains some evidence that ADS became a party to the written manufacturer's representative

agreement, either by supplanting Hancor or by adding itself as a manufacturer, and because Hancor concedes that summary judgment is not appropriate on certain theories of breach, the Court cannot completely grant ADS' summary judgment motion.

Mr. Ragen has pointed to no evidence showing that ADS has contractual liability other than by supplanting Hancor's role, either partially or completely. That is, to the extent Mr. Ragen can show that ADS became a party to the contract, Hancor's liability is reduced. No theory of contract breach stands outside this zero-sum relationship between ADS and Hancor. Nonetheless, ADS remains as a party so Mr. Ragen can advance his theory that ADS became a party to, and then breached, the agreement.

Because ADS and Hancor are fused – that is, in the same role – for purposes of analyzing whether either breached the agreement, the partial grant of summary judgment on some of Mr. Ragen's theories of breach apply to ADS as well. To the extent the Court finds evidence of a certain theory of breach lacking against Hancor and grants partial summary judgment on that theory, the grant extends to ADS as well.

## B. BREACH OF CONTRACT

Mr. Ragen asserts that Hancor and ADS breached the written agreements in several ways. Hancor has moved for partial summary judgment on a number of Mr. Ragen's theories of breach of contract and the Court will consider these as including ADS to the extent appropriate. Mr. Ragen opposes summary judgment on the breach of contract questions.

### 1. TERRITORIAL AND ACCOUNT MODIFICATIONS NOT MADE IN WRITING

23

Hancor has indicated that its summary judgment motion does not encompass Mr. Ragen's assertion that Hancor breached the written agreement by modifying his territory and removing customers without committing either of those changes to writing, except that the removal of the customer Kennedy Culvert is included in the scope of the summary judgment motion. These territory and account modification claims are essentially the claims raised in Mr. Ragen's summary judgment motion, and the Court noted in the previous section that Hancor had pointed to enough evidence that Mr. Ragen may have waived his right to bring these claims to deny his summary judgment motion and preserve the issue for trial. Hancor acknowledges that Mr. Ragen can point to evidence that the territorial and account modifications (other than the Kennedy Culvert reassignment, which is addressed in Section 3, *infra*) were breaches and its defense rests on the fact-intensive waiver (and other fact-intensive theories), so these alleged breaches are outside the scope of this Order and are preserved for trial.

2. EXCLUSIVE TERRITORY

Mr. Ragen asserts his contracts with Hancor appointed him as an exclusive sales representative for a given territory and that Hancor breached the agreements over the years by not paying him a commission on some of the sales within the appointed territory. In spite of Mr. Ragen's contention to the contrary, a considerable amount of the dispute hinges on this question for two reasons. First, Mr. Ragen would like to use this theory to support his claim to commissions when a Hancor inside sales representative handled an account (as was the case with certain national accounts). Second, and more significant financially, after ADS' acquisition of Hancor, the two companies (which were formerly competitors in the market) maintained their legacy sales forces, which then overlapped each other in territory. That is, after the merger, as Mr. Ragen

24

continued selling legacy Hancor products in the geographic region in which he had previously sold them, one or more ADS representatives were selling ADS products in the same geography.

Mr. Ragen asserts that because his territory – as created in each of the seven agreements – was exclusive and because ADS assumed the role of "Manufacturer" under the 2001 agreement after the acquisition, he is entitled to commission on every ADS product sold in his territory. He proposes two bases for his exclusivity theory: this Court's January 19, 2010 Order and the language of the contracts, augmented by the parties' conduct in performing the contract. Hancor says that Mr. Ragen was never an exclusive sales representative and refutes these positions. It further proposes that, even if the agreement made Mr. Ragen exclusive in a territory, he waived his right to collect commissions because he did not raise the issue and instead allowed Hancor to proceed on the assumption that it had fully compensated Mr. Ragen when it paid him on the set of sales it credited to him. The waiver theory is fact intensive and undoubtedly outside the scope of summary judgment, but the Court need not address it because it will grant Hancor's motion on the exclusivity question based on contract interpretation. In analyzing Mr. Ragen's theories, the Court focuses not on the weight of the evidence, but on whether Mr. Ragen can present some evidence tending to show he had an exclusive appointment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

a. THE COURT'S JANUARY 19, 2010 ORDER

In the Court's January 19, 2010 Order denying, in relevant part, Hancor's motion to dismiss, the Court found (in the context of ruling on a Rule 12(b)(6) motion),

> Nothing in the contract expressly limited the Representative's commissions to sales he actually procured, and the Court declines to read such a term into the contract. The structure of the contract, which obligated the Representative to hire additional salespeople to sell Hancor products at his own expense within his territory, would

> make little sense if the Representative were only entitled to commissions on sales for
> which he personally produced a buyer . . .. Rather, the contract is most sensibly read
> in accordance with the plain meaning of its terms: the Representative was to be paid
> on the basis of the net sales amount collected in his territory.

(Doc. 68 at 3-4 (quotation and citation omitted).)

Mr. Ragen stretches too far the language in this Order on the motion to dismiss. He quotes

the Court and contends that the Court's order makes the question of exclusivity moot because it

decides that the language of the contract does not require him personally to make a sale in order to

earn a commission on that sale. (Ragen Opp., Doc. 131 at 33.) He proposes this has reduced the

issues before the Court: "[T]he actual issue before the court concerns what constitutes Mr.

Ragen's defined territory." *Id.* Yet, the Court's observation in the context of ruling on a motion to

dismiss is not properly addressed to the summary judgment question; a conclusory statement by

the Court written in the context of deciding a motion to dismiss is not evidence itself that Mr.

Ragen can use to defeat a summary judgment motion. Instead, the ruling means that the express

terms of the contract do not foreclose the possibility that the territory was exclusively Mr. Ragen's

(and, for that reason, judgment in Hancor's favor on its motion to dismiss was not appropriate).

Mr. Ragen's evidence of exclusivity remains the contract and its language, not the Court's Order

deciding a motion brought under Federal Rule of Civil Procedure 12(b)(6). The Court must look to

the evidence in the record - both the contract itself, which was available when ruling on the

motion to dismiss and the other evidence, which was not available in that context - to decide the

question of exclusivity.

b. THE AGREEMENTS' LANGUAGE

26

Mr. Ragen asserts that his agreements with Hancor created an exclusive territorial appointment and that both the contractual language and the parties' conduct over the span of the relationship substantiate this. The six agreements created between 1992 and 2001are essentially identical in terms relevant to this discussion. (The other agreement, created in 1988, uses different language, but is not relevant because none of Mr. Ragen's claims relate to the time under that agreement). The 2001 agreement provided, in relevant part:

> APPOINTMENT. Representative is hereby appointed as the Manufacturer's Direct Sales Representative for all products manufactured by Manufacturer (the "Products") for the accounts described on the attached territory or account outline (the "Territory").

(Doc. 52-10 at  1. (Attached to the 2001 agreement are both a customer list and a map, marked "Ragen Associates Sales Territory - CP, R/C, AG Markets (Albano=CP Market only)" and with certain territories colored in).)

> OBLIGATIONS AND RIGHTS OF REPRESENTATIVE
>
> a) Best Efforts. Representative shall:
>
>> i) Use its best efforts to market, promote and sell Products in the Territory by all means at its disposal, including direct sales contracts through personal calls to specifying engineers, dealers, contractors, and stocking distributors.
>>
>> ii) Maintain, at its own cost and expense, a sufficient number of qualified salespeople as mutually agreed by Manufacturer and the Representative, who will actively solicit orders for the Products in the Territory.

(*Id.* at ¶ 5(a).)

> Customers. The Representative shall have the right to solicit and take orders from customers and accounts outside the Territory that are not assigned to a Direct Sales Representative of Manufacturer. Before soliciting such a customer or account, the Representative must receive, in writing, authorization to proceed in selling to such a customer or account.

(*Id.* at  5(c).)

27

> COMPENSATION. As compensation for the Representative's services, the Manufacturer shall pay to the Representative a commission on the net sale amount collected. Commission shall be paid by Manufacturer to Representative at the end of each month based upon the previous month's net sales amount collected after deducting discounts, allowances, taxes, rebates, and returns as described in the Commission Schedule.

(*Id.* at 7.) A document entitled "Manufacturer's Representative Commission Schedule" and another entitled "Manufacturer Reps 2001 Incentive Compensation Program" are attached.

The Ohio Supreme Court has explicitly defined the Court's role when considering questions of contract interpretation:

> When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.

*Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011) (quotation omitted).

On its face, the contract only says that Mr. Ragen is, "appointed as the Manufacturer's Direct Sales Representative . . . for the accounts described on the attached territory or account outline." (Doc. 52-10 at ¶ 1.) Each relevant agreement attaches at least a territorial map. This leaves ambiguous whether "the" modifies "Manufacturer" or "Representative." That is, if Mr. Ragen can advance the theory that the contract appoints him as *the* representative for Hancor in a given territory, then he may be able to advance the theory that he is entitled to a commission on every sale within that territory. However, if he is just *a* representative for *the* manufacturer in a given territory, then the language of the contract may disfavor his theory. Because the language leaves ambiguity, the Court must look further for the parties' intent. *Sunoco* 953 N.E.2d at 292; *see also State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004)

("Courts resort to extrinsic evidence of the parties' intent only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." (quotation omitted)).

Hancor points to the negotiations preceding the 1992 contract as evidence showing that neither its nor Mr. Ragen's intent was that the appointment of Mr. Ragen as a sales representative was to be exclusive. In the contract negotiation process, Hancor sent a proposed agreement including the words, "appointed as the Manufacturer's Direct Sales Representative." Mr. Ragen inserted the word "exclusive" before "Manufacturer's," initialing the change and submitting it back to his contact at Hancor for acceptance. (Doc. 119-1 at 6.) Hancor accepted other changes Mr. Ragen proposed, but flatly rejected the addition of the word "exclusive." Courts give significant weight to terms that are separately negotiated or added to an otherwise standardized agreement. Restatement (Second) of Contracts § 203 ("[S]eparately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated."). In this case, the inverse can become true; the negotiated exclusion of a handwritten term is a strong indicator of the parties' intent. *See also Dorsey v. Contemporary Obstetrics & Gynecology, Inc.*, 680 N.E.2d 240, 246 (Ohio Ct. App. 1996) (noting that the most commonly employed parol evidence to determine an ambiguous term's meaning is evidence of the negotiations); *Pharmacia Hepar, Inc. v. Franklin*, 676 N.E.2d 587, 592 (Ohio Ct. App. 1996) ("Preliminary negotiations may be considered for the purpose of explaining ambiguous language into a written contract."). The evidence of this negotiation strongly favors Hancor; a term specifically negotiated and then excluded by the parties speaks strongly to their intent entering the contract.

Mr. Ragen says the Court should look to the parties' conduct under the agreements to conclude that they executed their duties as if he had territorial exclusivity. The Court may use the parties' course of performance to create a practical construction of a contract's ambiguous terms. *St. Marys v. Auglaize County. Bd. of Comm'rs*, 875 N.E.2d 561, 568 (Ohio 2007); 18 Ohio Jur. 3d Contracts § 129. That is, where a term could be read in two ways, the Court can take the parties' own reading of it – their practical construction of it – as authoritative. *St. Marys* 875 N.E.2d at 568; *see also* Restatement (Second) of Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

In Mr. Ragen's favor is that he may be able to show that, even when Hancor hired internal employees to call on customers in Mr. Ragen's territory, Mr. Ragen still received a commission on sales they generated. (Ragen Dep. Sept. 14, 2011, Doc. 108 at 8-9 (expounding on the internal sales representative program and saying, "Q. So despite the fact that the report itself would indicate that [the inside sales representative] got credit, in fact, Ragen Associates was still supposed to be paid a commission under the inside sales team policy or program? A. Yes.").) Mr. Ragen even indicated this was the case when the inside sales representative brought in the account himself. (*Id.* at 9.) Mr. Ragen said that he had no issue with the creation of the inside sales team because it freed up his time to call on bigger accounts without reducing his income, "particularly because I was still being paid a commission on them." (*Id.* at 12-13.)

While the inside sales program is evidence of some inclination on Hancor's part to assign accounts to Mr. Ragen in his territory even when some of the selling was done by Hancor's own

30

employees, it is not in itself evidence that every sale within the territory generated a commission payable to Mr. Ragen. Hancor points to Mr. Ragen's concession that he knew that Hancor assigned other sales representatives to the same geographic territory, just limited to other types of products or accounts. (Ragen Dep. Aug. 16, 2010, Doc. 107 at 166-68 (acknowledging many instances of, and detailing a time when, Mr. Ragen saw ADS pipe delivered to his customer's yard but knew he was not being paid a commission on that sale.); *id.* at 133-134 (acknowledging that he knew ADS employed representatives and if ADS were to pay him for sales made by ADS representatives, it would be paying two commission on each sale.); Ragen Dep. Sept. 14, 2011, Doc. 108 at 23 ("Q. And do you – are you aware of Mr. Zak selling into the recreational market in an overlapping geography in which Ragen Associates served? A. I don't recall that, except through what I've seen in Discovery, I know there was some people he sold to that were in my territory."); *id.* at 25-26 (acknowledging that he was aware of certain national account representatives who would handle certain types of transactions in his territory); *id.* at 58-64 (acknowledging that smaller, "residential/commercial" accounts in Mr. Ragen's Connecticut territory were handled by another representative and that Mr. Ragen was not claiming a commission on those in this suit); *id.* at 106-107 (conceding that he acquiesced to the other sales representative in Connecticut).)

In aid of term construction, courts can put significant weight on whether a party knew – or had reason to know – that the other party was interpreting a term differently while the other party did not know – or have reason to know – of the difference. Restatement (Second) of Contracts § 201(2). In *LaConte Enter. v. Cuyahoga County.*, the court found against a county that believed a lease provision indicated that the plaintiff was not exempt from a certain tax because it found the

31

county had reason to know that the plaintiff would expect the clause created a tax exemption and the plaintiff had no reason to know the county read it otherwise. 764 N.E.2d 1051, 1054-55 (Ohio Ct. App. 2001) (citing Restatement (Second) of Contracts § 201(2)). This principal aligns closely with equitable estoppel, which prevents a party from taking a certain position, misleading the other party to act upon that position to its detriment, then claiming contrary position. *Jackson v. Republic-Franklin Ins. Co*, 584 N.E.2d 52, 56 (Ohio Ct. App. 1990); *see also Hampshire County Trust Co. of N. Hampton, Mass. v. Stevenson*, 150 N.E. 726, 730 (Ohio 1926) ("[A] party actively affirming a transaction such as a contract or a purchase, by receiving and retaining money upon it, is estopped thereafter to deny the force of any of its express or implied terms or conditions." (citation omitted)); *London & Lancashire Indem. Co. of Am. v. Fairbanks Steam Shovel Co.*, 147 N.E. 329, 334 (1925) ("This estoppel arises when one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist, and such other rightfully relies and acts on such belief." (citing 21 Corpus Juris, § 116, p. 1113)).

Hancor points out that Mr. Ragen had reason to know that it was not interpreting the agreement as an exclusive one where Hancor had no reason to know that Mr. Ragen did assume it was exclusive.

Q. Did you ask anybody, Hey, Ms. Zimmerman sold this project but it's in my territory, shouldn't I get the commission?

A. No.

Q. And did you --

A. There's a reason. I didn't focus on commissions every day. There were issues that would occur and I would go out and deal with them and I was fine. When a customer would call up with a complaint or somebody did this or somebody did that, I didn't immediately say, Gee, what's my commission on that. My initial reaction was, How

32

do I satisfy the customer and make the customer happy. My commission was way down on the priority list and rarely, if ever, thought of.

Q. You weren't concerned with how much you were getting paid for the services you were providing?

A. No, I would get a check every month and if it was a good check, I was happy. I didn't diagnose every order every day, no.

Q. Is it your testimony as you sit here today that you would receive - your practice throughout the course of your time with Hancor is that you would receive a check and you were not concerned with the underlying support for that check?

A. Generally not, because that underlying support would go to hundreds of lines of information, and I would get - I would look at the check, I would deposit it in the bank. If something seemed grossly wrong about it, I might question it, but there -- when there were issues, my commission wasn't the primary concern. I was trying to build a market, satisfy customers, deal with problems, grow that market, all those things.

(Ragen Dep. Sept. 14, 2011, Doc. 108 at 26-28.)

Mr. Ragen possessed the means, by analyzing the "hundreds of lines of information" that underlay the amount of his commission check, to confirm whether he was being paid properly. *Id.* While this may have been tedious and cumbersome to do with every payment, Mr. Ragen claims Hancor did not fully compensate him from 1993 to 2007. The alleged underpayment is based entirely on a difference in the construction of the contract (that is, Mr. Ragen thinking he had an exclusive territory and was due commission on every sale and Hancor thinking otherwise). Therefore, even if Mr. Ragen did not actually know Hancor was not paying on every sale in the territory, he had reason to know that he viewed the exclusivity question differently by comparing his sales figures to those used to create his commission check. The Restatement precisely addresses this:

> Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . .

33

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

Restatement (Second) of Contracts § 201(2); *accord LaConte Enter.* 764 N.E.2d at 1054-55.

Moreover, Hancor has introduced evidence that Mr. Ragen did sometimes raise questions about how his commissions were calculated. (Docs. 138-1 & 138-2 (emails between Mr. Ragen and his Hancor contact regarding certain commission questions).)

In its waiver argument, Hancor argues that Mr. Ragen is not entitled to raise a claim of breach where he accepted their alleged sub-standard performance for so many years and gave the impression – inconsistent with claiming a right – that he accepted Hancor's breach. The analysis in this section has elements similar to the analysis of waiver, but where waiver in this case presents questions of fact that must be tried, this contract interpretation question is a matter of law appropriate for summary judgment. *Long Beach Ass'n, Inc. v. Jones*, 697 N.E.2d 208, 209 (Ohio 1998) ("The construction of written contracts and instruments, including deeds, is a matter of law."). This interpretation does rely on a potential fact determination – that is, whether Mr. Ragen can point to some evidence in the record that the parties carried out the agreements as if they granted Mr. Ragen an exclusive territory. The only evidence Mr. Ragen can point to that consistently tends to show a question of fact regarding territorial exclusivity is his own subjective belief in that fact. While that evidence may suffice in other analyses, it conflicts with the Restatement provision that charges him with the knowledge (accessible via analyzing his commission checks) that Hancor interpreted the provision differently. Therefore, Mr. Ragen's subjective view of the agreement's provision is insufficient to avoid summary judgment and Hancor is entitled to judgment on any claim based solely on a theory that Mr. Ragen had an exclusive territory and is owed commissions on every sale within that territory.

34

3. THE KENNEDY-CULVERT ACCOUNT

In their 1996 agreement, Hancor and Mr. Ragen agreed that Mr. Ragen was appointed as the sales representative for, "accounts described on the attached territory or account outline." (Doc. 52-7 at 1.) Attached to that agreement is a map of New Jersey designating all but two counties as "Ragen." (*Id.*) Between the inception of that contract and early 1998, Mr. Ragen sold to a customer called Kennedy Culvert, who was chiefly located in that territory but also had facilities in Pennsylvania. (Ragen Decl., Doc. 131-2 at 5.) Due to clashes between Mr. Ragen and the customer, however, Hancor reassigned the account – and its resulting commissions – to another salesperson in January 1998. (Ragen Dep. Aug. 16, 2010, Doc. 107 at 186-88 (detailing Mr. Ragen's memory of a series of arguments with the customer that led to the reassigning of the account).)

Hancor claims that its decision to move the account to another representative was a sensible business decision within the scope of its contractual right to make all business decisions, include the sale and marketing of products. (*See* Doc. 52-7 at ¶ 4 ("OBLIGATIONS AND RIGHTS OF MANUFACTURER. Manufacturer shall: a) Produce products of high quality at competitive prices, provided, however, that all business decisions, including, without limitation, those related to the manufacture, sale, pricing and marketing of Products shall be under the sole control of Manufacturer.").) Further, Hancor points out that, while some sales to Kennedy Culvert were within the territory created by the 1996 agreement, those sales to Kennedy Culvert's Pennsylvania facilities were never in the territory created by the contract, and therefore they could not have breached in regards to these modifications.

35

Mr. Ragen has shown that the contract granted most of New Jersey to him as his sales territory and, at the time of the creation of the contract, this included Kennedy Culvert's New Jersey facilities (not because the territorial grant was exclusive but because it created a territory for Mr. Ragen and then he sold to that account for a while under the 1996 agreement). Mr. Ragen has also shown that the contract required that modifications be in writing and that no written modification was made until the creation of the 2001 contract. Hancor's defenses to this alleged breach of contract – that it acted within its rights granted by the contract and that Mr. Ragen waived his right to bring this claim by not terminating the contract when Hancor first allegedly breached it – are fact intensive and not appropriate for summary judgment. Thus, the Court denies Hancor's summary judgment request on the removal of Kennedy Culvert as a customer in apparent violation of the written terms of the 1996 agreement, as expressed in paragraph 184(c) of the complaint.

Hancor raises a more nuanced question regarding the reassignment of Kennedy Culvert's Pennsylvania locations. (Am. Compl., Doc. 52 at ¶ 184(d).) The 1996 agreement does not reflect any customer list and its territory list only includes maps of New Jersey and Connecticut. Therefore, Mr. Ragen cannot show that the Kennedy Culvert Pennsylvania locations were part of this written agreement. Nevertheless, the parties do not contest that Mr. Ragen sold to the Kennedy Culvert Pennsylvania locations between the creation of the 1996 agreement and January 1998, just as he did the New Jersey locations in the agreement's marked territory. The Court must draw reasonable inferences from the facts in favor of Mr. Ragen as the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Because the evidence shows that Mr. Ragen and Hancor immediately started executing the 1996 agreement as if the

36

Kennedy Culvert Pennsylvania facilities belonged to Mr. Ragen as the representative in charge of the Kennedy Culvert New Jersey facilities, Mr. Ragen may be able to show that the course of performance was for out-of-territory affiliates of a customer to be assigned as a bundle. Courts can use the course of performance of a contract to ascertain the parties' intention regarding a certain term. *See* Restatement (Second) of Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."). While course of performance is given less weight than express terms, it is not without weight (*see id.* at § 203(b)) and, in this case, enough evidence is in the record to prevent summary judgment and allow Mr. Ragen to show that the Pennsylvania facilities should at least be considered along with the New Jersey facilities when answering the question of whether Hancor breached the agreement by reassigning the Kennedy Culvert account. Therefore, the Court denies Hancor's summary judgment motion as to this point.

### 4. HANCOR'S AND ADS' POST-ACQUISITION PRICING AND POLICIES

After ADS acquired Hancor and integrated its staff, including Mr. Ragen, Hancor (or ADS, used interchangeably here; see Section V(A)(1), *supra*) implemented certain policy changes that Mr. Ragen says breached his agreement. In particular, Mr. Ragen takes issue with Hancor making his pricing and sales processes less competitive while bolstering the legacy ADS' representatives' ability to be competitive. Hancor says that the contract explicitly allows, "that all business decisions, including, without limitation, those related to the manufacture, sale, pricing and marketing of Products shall be under the sole control of Manufacturer." (2001 Agreement,

Doc. 52-10 at ¶  4(a).) Thus, even if post-acquisition policy changes favored legacy ADS representatives, those decisions do not breach the agreement. Hancor also points out that Mr. Ragen worked exclusively for Hancor, and he has not pointed to any evidence that Hancor treated its sales representatives differently, only that ADS treated Hancor representatives differently from ADS representatives after the acquisition. This second argument may be compromised by the Court's finding, *supra*, that Mr. Ragen may be able to show that ADS became a party to the agreement, but further analysis is not necessary because Mr. Ragen cannot show that a disparity between representative groups breaches the agreement.

Mr. Ragen's complaint alleges that ADS treated legacy ADS representatives better than him after the acquisition by: imposing less advantageous pricing on him and allowing ADS representatives better pricing and selling terms (*see* Am. Compl., Doc. 52 at ¶¶ 191(a), 191(c), 191(g), 191(h), 191(i), 191(j), & 191(k)); taking away his opportunity to sell certain products (*see id.* at ¶ 191(b)); collecting his sales data for the benefit of ADS representatives (*see id.* at ¶ 191(d)); making his sales procedurally more difficult and ADS representatives' easier (*see id.* at ¶ 191(e)); using his work product for the benefit of ADS representatives' sales (*see id.* at ¶ 191(f)); and disallowing him to sell to customers who had a relationship with an ADS representative (*see id.* at ¶¶ 191(l), 191(m), 191(n), & 191(o)). Nevertheless, Mr. Ragen has provided the Court with no citation to law that would support his contention that these sales policies amount to breaches of the agreement. The Court considered whether these allegations alone amounted to breach and decided that dismissal under Rule 12(b)(6) was not appropriate and Mr. Ragen was entitled to use discovery to flesh out the allegations themselves as well as the contract's interpretation. (Doc. 68 at 6).

38

Mr. Ragen points out that the agreement specified that, "The manufacturer will maintain and enforce all sales policies that govern sales activities." (2001 Agreement, Doc. 52-10 at ¶ 12.) He says that this provision requires Hancor to maintain all current sales and pricing policies and in allowing the new policies to favor ADS representatives, Hancor breached by abdicating its duty to maintain the policies. The next sentence of the contract allows that the, "Manufacturer may amend or suspend certain provisions as deemed appropriate for the company." (*Id.*) Mr. Ragen has pointed to neither evidence in the record nor legal authority that would indicate that maintaining a sales policy means maintaining the current policy without change, particularly when the contract explicitly provides for amendment.

Hancor analyzes Mr. Ragen's claim that it breached the contract by creating allegedly unfair sales policies by using Ohio's implied duty of good faith and fair dealing in executing contracts. *See Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005) ("[P]ublic policy dictates that every contract contain an implied duty for the parties to act in good faith and to deal fairly with each other. Any agreement – whether a lease, a secured loan, or something else – has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract."). The Court agrees that, lacking any other authority, Mr. Ragen's allegations of unfair treatment are best analyzed using this doctrine. The implied contractual duty to act in good faith does not reduce a party's right to strictly enforce the terms of a negotiated agreement to its own benefit and, "even to the great discomfort of [its] trading partner." *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1082 (Ohio 1996). A contract's express terms are subject to breaches of the duty to act in good faith only when a party, in executing the agreement, takes "opportunistic advantage in a way that could not have

been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Id.* at 1082-83. While Hancor's acquisition by ADS may have been unanticipated when Mr. Ragen and Hancor entered into the 2001 agreement, Mr. Ragen has pointed to no evidence suggesting that the post-acquisition policy changes rise to the level of ADS or Hancor taking "opportunistic advantage" of him. The agreement gave Mr. Ragen the right, on thirty days written notice, to terminate his relationship, discontinue his sales efforts, and discontinue receiving commission payment for those efforts. (2001 Agreement., Doc. 52-10 at ¶ 9.) Because the agreement amounted to a pay-as-you-go agreement for services over many years, Hancor's imposition of new policies, even were they unfair, do not rise to the level necessary to find a breach of good faith in executing the terms of the agreement and the allegations do not merit further analysis under any other theory of law. The Court grants Hancor's summary judgment motion as to these claims.

5. ASSIGNMENT OF THE AGREEMENT TO ADS

Mr. Ragen asserts that Hancor breached the 2001 agreement by assigning it (either the contract as a whole or certain duties and benefits under it) to ADS following the acquisition. The Court analyzed whether Mr. Ragen has some evidence demonstrating that ADS joined the contract as a party and determined that Mr. Ragen can move forward with this theory. *See* Section V(A)(1), *supra*. Sometime after the acquisition, Mr. Ragen's manager began talking about Mr. Ragen's contribution to ADS. (Ragen Decl., Doc. 131-1, at 185 (email reprimanding Mr. Ragen for his obsession with the fairness of pricing after the acquisition and admonishing him, "I would propose your time would better serve the ADS organization if you were to spend three days a week in the Lower Hudson Valley calling on contractors and engineers with your distributors.").) ADS paid

Mr. Ragen directly. (Doc. 131-3 at 138-149 (mix of Hancor and ADS checks paying Mr. Ragen); *id.* at 151 (2007 Form 1099 issued by ADS to Mr. Ragen).) Finally, ADS terminated Mr. Ragen. (*Id.* at 160 (letter on joint Hancor/ADS letterhead terminating Mr. Ragen: "Pursuant to our contract with Ragen Associates . . . this will serve as our 30-day notice of termination of your services for Advanced Drainage Systems, Inc.").)

This is sufficient to show some evidence that Hancor assigned the agreement to ADS and avoid summary judgment. Hancor's argument that, at most, it only assigned certain duties and rights under the contract does not prevail at the summary judgment stage because the Court cannot weigh the evidence and can only test whether Mr. Ragen has some evidence supporting his claim. He does.

Hancor also contends that Mr. Ragen cannot move forward on this claim because he cannot show that the assignment damaged him. In fact, Hancor can show that, at least in certain ways, Mr. Ragen benefited from ADS taking over Hancor's operations. (Ragen Dep. Aug. 16, 2010, Doc. 107 at 92-93 (acknowledging that before the acquisition, "Hancor was a wreck," and, after ADS took over, product moved out to customers, which benefited Mr. Ragen).) In contrast, Mr. Ragen says that the assignment damaged him when ADS imposed onerous sales policies that restricted him from making certain sales and made other sales more difficult to obtain. (*See generally* Am. Compl., Doc. 52 at ¶ 191; *see also* Section 4, *supra* (finding that Mr. Ragen's claims that the new policies damaged him cannot survive summary judgment, not because they are not well-taken but because Hancor was within its rights to implement them).) Hancor does not deny that it imposed these policies on Mr. Ragen and has pointed to no evidence indicating that the policies did not restrict Mr. Ragen's commissions or otherwise make his duties more difficult.

41

Mr. Ragen can show that, per the agreement, Hancor was required to obtain his written consent before it assigned the contract. He can demonstrate some evidence from which a finder of fact could decide that Hancor assigned the agreement to ADS. Neither party has tried to show that Mr. Ragen did consent in writing explicitly or implicitly (and such evidence would very likely still not allow resolution at the summary judgment stage). Finally, Mr. Ragen can demonstrated that he suffered certain disadvantages after the acquisition, and while the nexus between the new policies and the assignment of the contract are weak, he has demonstrated enough to avoid summary judgment and proceed on this claim.

6. TERMINATION OF THE AGREEMENT

Mr. Ragen asserts that, if ADS did not become a party to the 2001 agreement, then the agreement was not terminated and Hancor breached by not paying commissions after December 7, 2007. He bases this theory on the language of the November 8, 2007 termination letter, which informs him that, "this will serve as our 30-day notice of termination of your services for Advanced Drainage Systems, Inc." (Doc. 131-3 at 160.) He theorizes that if only Hancor was a party to the agreement, then the letter terminating his services to ADS would not act to terminate his agreement with Hancor. While the Court is allowing Mr. Ragen to proceed past summary judgment on the theory that ADS became a party to the contract, see Section V(A)(1), *supra*, the Court is not making the determination that ADS was, in fact, a party and Mr. Ragen may not prevail on this theory at trial. Therefore, the Court's consideration of this alternative theory is appropriate.

The agreement allows termination by either party: "This Agreement may be terminated by either Manufacturer or Representative after providing the other party thirty (30) days advance

42

written notice." (Doc. 52 at ¶ 9(a).) The letter terminating Mr. Ragen was on joint ADS/Hancor letterhead and, in contrast to the ADS reference in the text, it was signed by, "Mike Swedick, Zone Manager, Hancor - Eastern Zone." (Doc. 131-3 at 160.) Mr. Ragen concedes that he understood this letter - and the meeting in which it was delivered – as his complete termination of services to Hancor. (Ragen Dep. Oct. 21, 2011, Doc. 109 at 551-552 ("Q. So you didn't have an understanding on November 7, 2007 that you would continue to be employed by Hancor? A. No. Q. Okay. A. The only way that has come up is in this lawsuit in the event that the end ruling is that ADS was not a party to the contract, which never entered my mind until, you know, after this action commenced. Q. But when you met with Mr. Swedick, you didn't have any confusion at that point or thereafter that your relationship with Hancor was also being terminated? A. No confusion at all.").)

"In construing the terms of any contract, the principal objective is to determine the intention of the parties." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 900 (Ohio 1999). While the termination letter itself is not a contract, Mr. Ragen has presented the Court with no authority demonstrating that the Court should construe a letter purporting to terminate a contract, per its terms, in a way that violates both parties' intent and understanding at the time Hancor's manager wrote it and delivered it to Mr. Ragen in a meeting. The intent of the letter is apparent on its face and Mr. Ragen acknowledges he fully understood it when he received it. The Court cannot violate this intent and read an alternate understanding into the letter; Hancor's summary judgment motion must be granted on this point.

## C. ESTOPPEL

Mr. Ragen's fourth claim is an alternative or additional claim wherein he asks the Court to estop both defendants from denying many of the assertions he makes against them in other claims. Specifically, Mr. Ragen asks the Court to prevent both defendants from denying: "(a) Defendants were a single company; (b) Defendants operated as a single company; (c) Ragen had a contractual and business relationship with both Defendants; (d) both Defendants were parties to the 2001 Agreement; (e) ADS and Hancor were a joint "Manufacturer" under the 2001 Agreement; and (f) ADS and Hancor were both 'Manufacturers' under the 2001 Agreement." (Am. Compl., Doc. 52 at ¶ 203.) Mr. Ragen says both estoppel in pais and equitable estoppel support this fourth claim for relief.

1. ESTOPPEL IN PAIS

Mr. Ragen invokes estoppel in pais and requests that the Court estop ADS from denying the existence of a contract between him and ADS because ADS reaped the benefits of the sales relationship after acquiring Hancor. "[A] party cannot be permitted to retain the benefits of a contract and at the same time repudiate it or reject its burdens." *Ohio Bank v. Beltz*, No. 8-02-13, 2002 WL 31084936, ¶ 27 (Ohio Ct. App. Sept. 19, 2002) (citing *Buydden v. Mitchell*, 102 N.E.2d 21, 23 (Ohio Ct. App. 1951)). This equitable principle prevents a would-be party from simultaneously claiming there is no contract (usually based on a technical flaw such as the lack of a writing where one is required) and also reaping the benefits provided by the other party as if there were a contract. It is rooted in preventing an equitable injustice caused by a party inducing another, through its behavior, to believe that a contract has been formed while inconsistently claiming no contract. *Pate v. Quick Solutions, Inc.*, No. 10AP-767, 2011 WL 3449619, ¶ 40 (Ohio Ct. App. Aug. 9, 2011) ("Applying [this doctrine], Ohio courts have recognized that estoppel

44

prohibits a party who accepts the benefits of a contract from denying the obligations imposed on it by that same contract.").

Mr. Ragen applies quotes from the cited cases to the facts of his relationship with Hancor and ADS and asks that the Court estop ADS since it reaped benefit from its relationship with him. Mr. Ragen points to evidence that ADS benefited from the sales relationship. ADS denies it had a contract with Mr. Ragen. This seems to fit the textual definition of retaining the benefits of a contract while repudiating its existence. *See Ohio Bank*, 2002 WL 31084936 at ¶ 27. Yet, this extends estoppel in pais beyond its equitable roots. ADS acquired its competitor, for whom Mr. Ragen provided valuable services, so the fact that ADS benefited from the efforts of Mr. Ragen is completely expected and does not invoke the doctrine of estoppel in pais. The doctrine applies when benefits are reaped and no other explanation exists aside from construing a contract in spite of a flaw in the formation of a contract. Such is not the case here; ADS may explain every benefit it received by pointing to the execution of the contract between Mr. Ragen and its subsidiary Hancor. Logically, to extend estoppel in pais to such situations would create a new right of action against third party beneficiaries and parent corporations. The Court cannot so stretch the equitable principle to meet the facts in this case. Nevertheless, this does not prevent Mr. Ragen from asserting that ADS joined the contract (*see* Section V (A)*, supra*), but it prevents him from using the doctrine of estoppel in pais to assert this claim.

Furthermore, while the doctrine of estoppel in pais may work in other cases to prevent a defendant from denying a contract, Mr. Ragen has not pointed to any case law for estopping Hancor from denying a contract between Mr. Ragen and ADS. First, Hancor was in contract with Mr. Ragen and does not deny that, so the doctrine has no direct application to Hancor. Second,

Mr. Ragen has provided the Court with authority that would suggest Hancor cannot deny the existence of a contract between Mr. Ragen and ADS. The equitable principal is constructed to protect the victim of another's contradictory conduct and has no apparent application to the conduct of third parties (as Hancor is to any purported contract between Mr. Ragen and ADS).

2. EQUITABLE ESTOPPEL

Apart from the estoppel in pais claim, Mr. Ragen asks that the Court estop both defendants from claiming (1) that ADS and Hancor were a single company, (2) that they operated as a single company, (3) that Mr. Ragen's contract was with both companies, (4) that both companies were parties to the 2001 agreement, (5) that ADS and Hancor jointly filled the role of "Manufacturer" under the 2001 agreement, and (6) that both companies were "Manufacturers" under the 2001 agreement. None of these is a valid equitable estoppel claim.

Equitable estoppel is invoked in the context of a contract when the terms of that contract are indefinite and one party accepts the other party's performance knowing that the performing party understands the terms differently. 42 Ohio Jur. 3d, Estoppel and Waiver § 84; *Jackson v. Republic-Franklin Ins. Co*, 584 N.E.2d 52, 56 (Ohio Ct. App. 1990).

> In order for equitable estoppel to apply, four prima facie elements which the plaintiff must set forth are: (1) that the party knowingly made a false representation or concealment of a material fact (or at least took a position contrary to that now taken); (2) that the representation must be made in a misleading manner with the intention or expectation that another would rely on it to act; (3) that the plaintiff actually relied on the representation; and (4) that plaintiff relied to his detriment so much that unless the party is estopped from asserting the truth or a contrary position, plaintiff would suffer loss.

*Jackson*, 584 N.E.2d at 56. The party to be estopped must know that the other party is interpreting a term of the contract differently than he does and must allow that party to continue delivering performance unaware that he will later claim a different construction of the contract. *Jerman v.*

46

*Fisher Foods, Inc.*, No. 33585, 1974 WL 184979 (Ohio Ct. App. Dec. 12, 1974) ("It has long been established that one who remains silent when he should speak and who accepts benefits from a contract with full knowledge of the facts and his rights, may be estopped from asserting any irregularity under the contract.").

All of Mr. Ragen's requests to estop boil down to his theory that ADS became a "Manufacturer" under the most recent agreement between Mr. Ragen and Hancor which leads to his contention that Hancor and ADS owe him commissions on all ADS sales in the territory he negotiated in 2001 with Hancor (before ADS acquired Hancor).

Mr. Ragen can point to some evidence that ADS and Hancor sent confusing messages about whether they were one company or two. Assuming, for the purposes of analyzing the estoppel question, that the defendants' assertion were incorrect in nature (that is, that they were two companies when they asserted they were one or they were one company when they asserted they were two), Mr. Ragen cannot show that he relied on these assertions to his detriment. To rely detrimentally on the assertion that the defendants were one company, he needs to show that ADS led him to believe it would compensate him for ADS products sold in his predetermined Hancor territory, that ADS knew he was misconceiving what the acquisition meant, and that he conducted himself differently thinking he was entitled to those commissions. *See Jackson*, 584 N.E.2d at 56. The equitable estoppel claim cannot survive where Mr. Ragen cannot show that he was without knowledge that he would not get paid on ADS sales. *Pedler v. Aetna Life Ins. Co.*, 490 N.E.2d 605, 608 (Ohio 1986) ("Obviously, a party who acts with full knowledge of the truth has not been misled and cannot claim estoppel. Hence, there can be no estoppel where the party claiming it is chargeable with knowledge of the facts, as where he either knows the facts or is in a position to

know them or the circumstances are such that he should have known them; or where the circumstances surrounding the transaction are sufficient to put a person of ordinary prudence on inquiry which would have disclosed the facts.") (quoting 42 Ohio Jur. 3d., Estoppel and Waiver § 66). Whether or not Mr. Ragen was led to believe that ADS and Hancor were one company or ADS was taking the role of manufacturer in the 2001 contract, very soon after the acquisition, he knew – or should have known – that he was not getting paid on sales of ADS product in the overlapping territory. Mr. Ragen received 29 commission checks between the time of Hancor's acquisition and his termination. (Ragen Dep. Oct. 21, 2011, Doc. 109 at 432-33.) Those put him on notice (whether actual or constructive) that he was not being paid on ADS' sales. Furthermore, Mr. Ragen explicitly says that he knew ADS representatives were selling in his territory and he was not being compensated on those sales. (Ragen Dep. Aug. 16, 2010, Doc. 107 at 166-68 (acknowledging many instances of, and detailing a time when, Mr. Ragen saw ADS pipe delivered to his customer's yard but knew he was not being paid a commission on that sale.); *id.* at 133-34 (acknowledging that he knew ADS employed representatives and if ADS were to pay him for sales made by ADS representatives, it would be paying two commission on each sale).) Mr. Ragen, therefore, cannot make the requisite showing that the defendants allowed him to continue in a misconception and suffer the detriment of that. Without the requisite showing, the Court grants the defendants' summary judgment motions on the estoppel claims.

### D. NON-CONTRACT THEORIES

Mr. Ragen raises several extra-contractual theories against ADS, and ADS asks for summary judgment on each one of the theories.

### 1. ACCOUNTING

48

In Claim 10, Mr. Ragen asks the court to order an accounting to provide him with information to assist him in calculating his damages. An accounting is a remedy demanded of a corporation by a shareholder or of a partnership by a partner to provide someone who has an equity interest in a company (or partnership) with information on his investment. Mr. Ragen cites *Krassen v. Climaco, Climaco, Lefkowitz & Garofoli Co., L.P.A.*, No. 80305, 2002 WL 1454066, ¶ 26 (Ohio Ct. App. Jul. 3, 2002) and quotes the determination,

> Counts V and VI assert that an accounting is necessary to determine the value of plaintiffs' interests in the Firm and in contingency fee cases. These accountings may be needed to assess plaintiffs' damages on the remaining claims for promissory estoppel, shareholder distributions and conversion. Therefore, the Firm is not entitled to judgment as a matter of law on the claims for an accounting.

*Id.* That case, however, is a suit brought by an equity partner and shareholder of a law firm against the firm and included counts demanding an accounting. Mr. Ragen has not pointed to any evidence that he is in the position of an equity holder of either Hancor or ADS and that he would thus be entitled to an accounting. Further, the information he requests appears to be discovery material, accessed through the discovery process, not by demanding an accounting. The Court, therefore, denies the claim for an accounting against Hancor and ADS.

## 2. TORTIOUS INTERFERENCE

Mr. Ragen claims that ADS tortiously interfered with the contract between him and Hancor (as an alternative theory if the Court finds that ADS was not a party to the contract). Because the Court is allowing Mr. Ragen to go forward on his theory that ADS was a party to the contract but also not specifically deciding either that ADS was a party or that it breached the agreement, this alternative, non-contract theory deserves exploration.

49

"The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995); *accord Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).

ADS asserts that a parent corporation cannot, as a matter of law, interfere with its subsidiary's contracts, and this is generally true. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 801 (6th Cir. 2007) (finding that, where one company acquired another, inserted its management, and transferred its customers, the acquiring company cannot tortiously interfere with a contract because the acquired company's contract was, in effect, its own contract); *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) ("[T]he trial court was correct in its conclusion that SPI, the parent company of Elder, was, in effect, the same entity as Elder, and, so, was privileged to become involved in the relations between Canderm and Elder."); *Kirk v. Shaw Envtl., Inc.*, No. 1:09-CV-1405, 2010 WL 1387887, * 8 (N.D. Ohio Mar. 31, 2010) (citing *Canderm* and *Servo Kinetics* and determining: "the Court concludes that, under Ohio law, a plaintiff cannot state a claim for tortious interference against a parent company for interfering with the business relationships, including employment relationships, of its subsidiary, because the parent company is not a third-party to its subsidiary's business relationships.").

Mr. Ragen contends that the Court of Appeals acknowledged an exception to a parent company's privilege to interfere with its subsidiary's contracts when "wrongful means" or

"improper purpose" are employed. *Speroni S.P.A. v. Perceptron, Inc.*, 12 F.App'x 355, 360 (6th Cir. 2001). The Court need not determine whether this unpublished opinion represents a new approach that reduces a parent company's privilege to interfere with its subsidiary's contracts for two reasons. First, the opinion only samples other courts in other states that have endorsed a "wrongful means" or "improper purpose" exception and then decides the plaintiff in that case had not provided proof of such, leaving the reader without a framework for creating such an exception. Second, the opinion explicitly endorses interference that causes contractual breaches and failures as long as those are in the interest of the subsidiary. *Id.* Mr. Ragen has pointed to no evidence that indicates ADS had any motive other than business interests. The Court cannot speculate what "wrongful means" and "improper purpose" entail except to note that Ohio law clearly allows parent companies to act – even aggressively – to further their business interests and these terms must refer to some behavior outside that. Mr. Ragen has pointed to no evidence that ADS compelled its subsidiary Hancor to breach Mr. Ragen's contract for purposes improper or by means that were wrongful, so the Court must grant ADS' summary judgment motion on this point.

3. DECLARATION REGARDING THE CONTRACT'S CONFIDENTIALITY OBLIGATIONS

In his eighteenth and nineteenth claims, Mr. Ragen seeks declaratory judgment, asking the Court to find the confidentiality provision contained in the 2001 agreement to be unenforceable. In the alternative, Mr. Ragen asks the Court to define the terms of the provision specifically to give him guidance on how it binds him. He offers two theories to challenge the confidentiality provision. First, he claims the provision is unenforceable as written because it is unreasonable in scope (Claim 18). Second, he posits it is unenforceable because Hancor and ADS materially breached the agreement first (Claim 19). Both Hancor and ADS separately ask for summary

judgment on these questions. ADS asserts (as it has elsewhere) that it is not a party to the agreement, making declaratory judgment on the provision improper. In the alternative, ADS joins in Hancor's position on each claim. Hancor says the agreement is enforceable as written because courts have upheld confidentiality provisions with indefinite terms and this one is less onerous because it is limited to ten years. Hancor denies breaching the agreement, but argues that even if breach occurred, Mr. Ragen's continued performance under the agreement waives his right to claim the breaches were material and that they act to void the confidentiality provision.

The Court, having previously found that Mr. Ragen may be able to show that ADS is a party to the contract, but that ADS' role is limited to Hancor's role (*see* Section V(A), *supra*), denies ADS' first theory on its summary judgment motion (that not being a party to the contract means the declaratory judgment action cannot be sustained against ADS). In keeping with this previous section's holding, the Court will treat ADS and Hancor as one, referring only to Mr. Ragen's relationship with Hancor, but leaving open the possibility that Mr. Ragen may show at trial that ADS supplanted Hancor's contractual role.

The Court need not delve into the fine details of the merits of Mr. Ragen's argument because he has not provided the Court with an indication of an actual, justiciable dispute and, therefore, that declaratory judgment is appropriate. Even though Hancor only invoked this argument as to Claim 18, this missing piece removes the Court's jurisdiction as to both claims and the court must address ripeness questions *sua sponte*, even when not pleaded.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides, among other things, a means for clarifying contractual obligations before a potential breach. *See Blakely v. United States*, 276 F.3d 853, 872 (6th Cir. 2002) ("[The] primary purpose of the Declaratory Judgment Act is to

52

avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued." (quotation omitted)). Parties may approach the court with a specific disagreement about the application of contractual terms and obtain a final judgment as to whether one party has a claim against the other even without creating that claim through breach. As opposed to advisory opinions, declaratory judgments are an appropriate use of the Court's power to decide cases and controversies when – and only when – an actual, justiciable controversy exists between the parties and resolution of that controversy would affect the parties' rights. *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 525 (6th Cir. 2012) ("Under Article III, the federal courts may exercise jurisdiction only if the parties have presented a live case or controversy. U.S. Const. art. III, § 2. We have no power to offer an advisory opinion, based on hypothetical facts."). "[W]e ask whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Commodities Exp. Co. v. Detroit Int'l Bridge Co.*, 695 F.3d 518, 525 (6th Cir. 2012) (citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)).

The mere potential for a future suit does not make a justiciable controversy. *Golden*, 394 U.S. at 108; *Blakely*, 276 F.3d at 872 (finding that declaratory judgment was not appropriate where the plaintiffs had failed to allege that they will actually engage in conduct that will run afoul of a statute and lead to a seizure of their assets). Similarly, parties in disagreement over the application of a contractual provision do not necessarily have a justiciable controversy for the purpose of declaratory judgment. Mr. Ragen ultimately carries a dual burden in this case. First, to defeat summary judgment, he must point to some evidence of an actual controversy before the

court. Second, he must show some evidence that he can prevail on that controversy. It is on this first point that Mr. Ragen's position struggles; he has not pointed to any evidence suggesting the existence of a justiciable controversy – or even the approach of one – between himself and Hancor over the confidentiality clause.

In Claim 18, Mr. Ragen's asks the Court to find the confidentiality requirement unenforceable as written. (*See* Am. Compl., Doc. 52 at ¶¶ 284 & 285.) However, in opposing Hancor's summary judgment motion, Mr. Ragen provides no further argument or legal support explaining why the confidentiality provision would be unenforceable as written. Instead, Mr. Ragen shifts gears slightly and asks the Court for a declaratory judgment in which the Court would explain how the provision is enforceable as written (for example, whether Hancor in its post-acquisition state could enforce the provision and what information is covered). (Doc. 131 at 57-58.)

Mr. Ragen's request exceeds the wording of his complaint and the role of this Court in a declaratory judgment action. In asking for clarification on eight hypothetical questions, he seeks an advisory opinion. The record lacks evidence, such as an indication that he is contemplating an action that Hancor claims would lead to litigation, that would indicate he has an actual, real, and justiciable dispute with Hancor (or ADS). Declaratory judgment requires an actual dispute – a real and justiciable controversy before the court may issue a ruling. *Kardules v. City of Columbus*, 95 F.3d 1335, 1344 (6th Cir. 1996).

In his nineteenth claim for relief, Mr. Ragen asserts that Hancor and ADS have lost their right to enforce the confidentiality provision because they breached the agreement first. *See* Restatement (Second) of Contracts § 237 ("Except as stated in § 240, it is a condition of each

54

party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). Mr. Ragen says the question of whether the defendants' breaches were material is one for the fact finder. ADS continues to claim that it was not a party to the agreement, so it could not have breached the agreement and is not subject to a claim requesting declaratory judgment on the provision's enforceability. Hancor asserts that it never breached the agreement and, even if it did, Mr. Ragen waived his right to raise a claim of breach and is therefore not entitled to declaratory judgment saying the confidentiality provision does not bind him.

The Court need not reach a conclusion on either defendant's position because, just as was the case with claim eighteen, Mr. Ragen has not shown that this matter is ripe for declaratory judgment. Even though the theory behind Claim 18 is vastly different from the theory behind Claim 19 (the former being that the confidentiality clause is unenforceable as written and the latter being that, if Hancor breached the contract materially, it cannot now enforce the confidentiality provision), judgment must be granted for the defendants for the same reason. A lack of a justiciable conflict deprives the court of jurisdiction to decide the declaratory judgment claims regardless of which theory Mr. Ragen used to forward them. With no evidence of a justiciable controversy to present to the fact finder, the Court must grant summary judgment on both declaratory judgment claims.

## VI. CONCLUSION AND REMAINING MATTERS

The Court denies Mr. Ragen's partial summary judgment motion (Doc. 114) in its entirety.

The Court grants ADS' summary judgment motion (Doc. 118) in part and denies it in part. It also grants Hancor's summary judgment motion (Doc. 119) in part and denies it in part.

The Court denies ADS' summary judgment motion on the theory that Mr. Ragen may be able to prove that ADS became a party to the agreement. Mr. Ragen has demonstrated some evidence that ADS became a party to the 2001 agreement - either by supplanting Hancor's manufacturer role or by joining the contract as a manufacturer. As such, ADS remains as a party as an alternate to Hancor; if Mr. Ragen can demonstrate at trial that ADS became a manufacturer under the contract and he can demonstrate that ADS then breached the agreement and damaged him, he may recover from ADS. In this sense, Hancor and ADS share liability and the principle of double recovery must limit any award. This applies to any breaches under Claim 2 not otherwise eliminated. (Am. Compl., Doc. 52 at ¶¶ 187-190, 192-194.)

The Court grants ADS' summary judgment motion on the theory that ADS and Mr. Ragen created a new, oral agreement after ADS' acquisition because Mr. Ragen has not demonstrated the terms of this would-be agreement and separately demonstrated breach of those. This eliminates Claim 6. (Am. Compl., Doc. 52 at ¶¶ 213-217.)

The Court grants ADS' summary judgment motion on the theory that ADS assumed Hancor's contractual liability created prior to its acquisition of Hancor. Hancor remains the only defendant liable for breaches prior to the acquisition. This applies to any breaches under Claim 1 not otherwise eliminated. (Am. Compl., Doc. 52 at ¶¶ 183-186.)

The Court grants ADS' summary judgment motion on the theory that Hancor's corporate veil should be pierced and ADS can be liable for Hancor's breaches after the acquisition because Mr. Ragen has not demonstrated the requisite facts or law to support this remedy. This applies to any breaches under Claim 2 not otherwise eliminated and Claim 7. (Am. Compl., Doc. 52 at ¶¶ 187-194, 218-225.)

Hancor's summary judgment motion excluded Mr. Ragen's contention that it breached the agreements by modifying his territory and removing customers (other than Kennedy Culvert) without his consent. Subsections (a), (b), and (e) of paragraph 184 within Claim 1 remain for trial against Hancor. (Am. Compl., Doc. 52 at ¶ 184.) Also, subsections (e), (f), (g), and (h) of paragraph 190 within Claim 2 remain for trial against Hancor and ADS. (Am. Compl., Doc. 52 at ¶ 190.)

The Court grants Hancor's summary judgment motion on those claims that rely on Mr. Ragen's contention that the agreement granted him an exclusive territory and Hancor owes him a commission on every sale within the territory. This eliminates subsections (f), (g), (h), and (i) of paragraph 184 within Claim 1 and eliminates subsections (a), (b), and (d) of paragraph 190 within Claim 2. (Am. Compl., Doc. 52 at ¶¶ 184 & 190.)

The Court denies Hancor's summary judgment motion regarding its removal of the Kennedy Culvert account from Mr. Ragen, including both the removal of the New Jersey customer facilities and the Pennsylvania customer facilities. Therefore, Claim 1, subsections (c) and (d) remain for trial against Hancor. (Am. Compl., Doc. 52 at ¶ 184.)

The Court grants Hancor's summary judgment motion regarding Mr. Ragen's allegations that it breached the agreement by altering its pricing and policies following the ADS acquisition. This eliminates all subsections in paragraph 191, within Claim 2. (Am. Compl., Doc. 52 at ¶ 191.)

The Court denies Hancor's summary judgment motion regarding Mr. Ragen's allegation that it breached by assigning the agreement to ADS. Therefore, paragraphs 218 through 222, 224, and 225 within Claim 7 remain for trial against Hancor and ADS. (Am. Compl., Doc. 52 at ¶¶ 218-222, 224, 225.)

The Court grants Hancor's summary judgment motion regarding the alleged breach created by not properly terminating the agreement or paying commissions after termination. This eliminates paragraph 223 within Claim 7. (Am. Compl., Doc. 52 at ¶ 223.)

The Court grants both defendants' summary judgment motions regarding the claims sounding in estoppel. This eliminates Claim 4 in its entirety. (Am. Compl., Doc. 52 at ¶¶ 202-206.)

The Court grants both defendants' summary judgment motions regarding the demand for an accounting. This eliminates Claim 10 in its entirety. (Am. Compl., Doc. 52 at ¶¶ 235-237.)

The Court grants ADS' summary judgment motions alleging tortious interference with the agreement between Mr. Ragen and Hancor. This eliminates Claim 15 in its entirety. (Am. Compl., Doc. 52 at ¶¶ 259-266.)

The Court grants both defendants' summary judgment motions regarding the two claims requesting declaratory judgment regarding the contract's confidentiality provision. This eliminates Claims 18 and 19 in their entirety. (Am. Compl., Doc. 52 at ¶¶ 283-288.)

Neither defendants' motion specifically addresses Mr. Ragen's allegation that it improperly calculated the commissions it did pay. (Am. Compl., Doc. 52 at ¶ 192.) The Court cannot determine if it eliminated the basis for this claim when it determined that the policy changes implemented after the acquisition did not breach the contract or if this stands as a claim of breach of contract for improperly calculating the commissions based on something other than the policy change. Since the burden is on the movant, the ambiguity favors Mr. Ragen and the claim remains for trial, at least on any theory not denied in this Order

58

Finally, neither Hancor's nor ADS' motion specifically addresses Mr. Ragen's allegation that, following the acquisition, Hancor breached the agreement by selling the Stormaster inventory to StormTech. (Am. Compl., Doc. 52 at ¶ 190(c).) The Court cannot determine if Mr. Ragen's theory on this claim sounds in territorial exclusivity and is therefore eliminated by this Order or if the claim is otherwise based and, therefore, absent a motion for judgment on it, stands. Since the burden is on the movant, the ambiguity favors Mr. Ragen and the claim remains for trial, at least on any theory not denied in this Order.

Thus, subsections (a), (b), (c), (d), and (e) of paragraph 184 within Claim 1 (and the associated paragraphs 181 to 183, 185, and 186) remain against Hancor. Subsections (c), (e), (f), (g), and (h) of paragraph 190 within Claim 2 (and the associated paragraphs 187 to 189, 193, and 194) remain against both Hancor and ADS for trial. Paragraph 192 remains against Hancor and ADS. And, paragraphs 218 through 222, 224, and 225 within Claim 7 remain against both Hancor and ADS.

IT IS SO ORDERED.

　　s/ *David A. Katz*　　　
DAVID A. KATZ
U. S. DISTRICT JUDGE

59